Appellants Michael Stewart and Tammy O'Connor ask for the reversal of three summary judgment orders that dismissed their fraud claims against the executives. The first of these summary judgment orders is the disclaimer of reliance order. The sellers sued the executives for fraudulent statements made before the parties executed their contract, the two most egregious of which were made by Defendant Cory. First, that Mr. Cory had pledged over $4 million in liquid net worth to secure Ethereo's debt with its mezzanine lender, when in fact a contemporaneous personal financial statement filed by Mr. Cory showed that he had less than $30,000 in cash or marketable securities. Second, that Mr. Cory was an enlisted Marine who became an Army captain and deployed to Iraq during the Persian Gulf War, all of which was false. Mr. Cory was never a Marine, he was never an officer in the Army, and he never deployed to Iraq. At the start of the Persian Gulf War, Mr. Cory was a 17-year-old cook in the Coast Guard who never deployed beyond Cape Cod, Massachusetts. To defend against these claims, the executives invoked the contract disclaimer of reliance clause. However, the parties agreed that the seller's disclaimer of reliance on extra contractual fraud carve-out plainly states that nothing in the disclaimer of reliance or anywhere else in the agreement would limit the seller's right to bring claims for actual fraud, including for violations of all applicable securities laws. The district court here erred by limiting the seller's claims to just those representations in the contract. That ruling rendered the fraud carve-out meaningless. The fraud carve-out whittled down the disclaimer of reliance. If the fraud carve-out did not recapture the right to sue for extra contractual fraud, then it serves no purpose and has no meaning. The ruling also violated the bargain struck by the parties. The sellers only agreed to disclaim reliance on Ethereum's extra contractual statements in exchange for the promise that the agreement where the disclaimer and the fraud carve-out were first added. In that draft, the executives refused to add additional intra-contractual representations on the grounds that the sellers, quote, have a fraud remedy. The only reason having a fraud remedy justifies not adding more representations inside the contract is if the parties had agreed that sellers could sue for representations outside the contract. If the court has questions about the disclaimer of reliance argument, I'm happy to answer them. Otherwise, given limited time, we'll move on to the loss causation argument. The second summary judgment order we ask the court to reverse is the loss causation order. In a securities transaction where direct misrepresentations induce the plaintiff to enter into a private contract, a plaintiff survives summary judgment on loss causation by creating a fact issue on whether the misrepresentation negatively affected the value of the plaintiff's investment. This loss causation inquiry focuses on whether the materialization of the risks concealed by the misrepresentations were one, foreseeable, and two, connected to the plaintiff's investment loss. In our case, both of the executives' intra-contractual representations concealed the same risk, that Ethereo would not have a chief financial officer to manage its finances. Without a CFO, the risk that financial mismanagement posed to a new company like Ethereo quickly materialized. Within eight months, Ethereo's mezzanine lender had declared the company in default on its debt, claiming that financial mismanagement, quote, caused there to be events of default. Those events of default were basic CFO tasks, such as timely providing monthly financials and ensuring that internal controls prevented the payment of illegitimate expenses and commissions to the company's CEO, Mr. Corey. This default on the mezzanine debt is directly connected to the seller's two types of economic loss. First, the seller's lost their $1.5 million earn out because it was subordinated to Ethereo's mezzanine debt. With that debt in default, the sellers could not be paid their earn out. That investment loss is unique to the sellers, which distinguishes our fact pattern from the typical fraud on the market case, and it is also foreseeable to all parties because the agreement states that the earn out will not be paid if Ethereo is in default to its debt with prudent capital, its mezzanine lender. The second loss suffered by the sellers is that they received $2 million in Ethereo shares that following the default were worthless. That can be determined from the executive's own expert who testified that after the default, it was, quote, a matter of financial certainty, close quote, that shares in Ethereo, including the 2 million shares owned by the sellers, were worth nothing. Now, that is a loss that would spread to every shareholder and is related to the devaluation of the stock, but that's not the only loss that the sellers suffer here. Yet the district court erred by holding that Ethereo's financial mismanagement did not cause the seller's economic loss. We believe that that was error for four reasons. First, the district court incorrectly held that Mr. Farb continued to serve as Ethereo's CFO after the closing. At the closing, however, Mr. Farb's title changed from CFO of Ethereo to Executive Vice President for Corporate Development. Along with that title change, his duties changed. He went from being responsible for doing things like preparing the financial statements that went to the mezzanine lender to only raising additional equity. Along with the change in duties, the amount of time he worked changed. He went from a full-time employee to a, quote, casual employee. In addition to the hours he worked, the length of time that he would work for the company changed. He had committed to be the company's CFO for three years. Now he would be its CFO for three months. Indeed, Mr. Farb testified that he was only, quote, acting CFO for, quote, two to three weeks after the closing. That's page 4188 of the record and directly contradicts the district court's conclusion that Mr. Farb continued as the company's CFO. Instead of Mr. Farb, Mr. Corey took Mr. Farb's place. We know that based on email correspondence that Mr. Corey sent where he stated that he had been, quote, a full-time CFO and controller for at least 90 days after the closing. And it was giving Mr. Corey control of the company that caused this default. It caused there not to be the reporting of monthly financial statements as was required. It caused Mr. Corey to be the one to submit to himself and then approve for himself the payment of illegitimate and unreasonable travel and these were all identified in the default letter from the mezzanine lender which is at page 8298 of the record. The second error that the district court made is that it inconsistently resolved the fact issue concerning Mr. Farb's honesty. The district court makes much of the fact that the plaintiffs alleged that Mr. Farb defrauded them but also claimed that Mr. Farb could have helped prevent Mr. Corey's fraud. Now, it's true that we pleaded that in the alternative here and certainly there is a world in which Mr. Farb would be found not to have defrauded us, yet Mr. Corey too have defrauded us, in which case there would not be an inconsistency. But you don't need to look any further than the district court's own opinion to realize that that conclusion by the district court was improper. In determining that there is a fact issue on the representation about Mr. Farb's manipulation of financial statements, the court wrote on page 9561 of the record that that issue is quote, better left to the accounting experts and the appraisal of trial testimony. It is improper for the district court to say in one argument, one representation, that there is a fact issue concerning Mr. Farb's honesty, yet later contend that it is undisputed that he was dishonest and therefore could not have prevented Mr. Corey's fraud. Third, the district court did not consider other evidence that gave context to and answered the district court's questions about the seller's evidence. And here we're primarily referring to the piece of evidence identified in the law's causation order, where Mr. Farb did not succeed in raising equity after he ceased to be the company's CFO. According to the capitalization table discussed in the causation order, Mr. Farb's goal was to raise somewhere between two and four million dollars in additional capital. And before Mr. Farb finalized his resignation, he wrote what we call the bold predictions, because the court can see them from the fact that Mr. Farb wrote them in bold red or blue letters and in all caps. In those predictions, he stated that he did not believe he would be able to raise equity for Ethereum once his title changed immediately after closing. And the reason for that was obvious. He was going to his personal connections to solicit an investment in a company where he was the chief financial officer. Once he was no longer the chief financial officer, he would be unsuccessful in the company. The court questioned, for example, whether or not these investors were uniquely important to Ethereum. We don't submit they were, but we do submit that it was important that Mr. Farb raised that two to four million dollars in capital, because that was the And we know from the record, page 7721, which is the stock register, that he was unable to raise even a million dollars of the amount of money he was trying to raise. Second, the court asked whether or not there was evidence in the record these two particular investors didn't invest. And the answer to that is there is. It's the stock register. The stock register by date lists the people who have made investments, and there's no line item for these gentlemen having made an investment after the date of the email that we cited. The fourth error that the district court made is they immunized Mr. Corey for his civil fraud by pointing to his criminal bank fraud. Essentially, what the district court found was that if Mr. Corey was rotten to the core, not to be funny about it, but if he were rotten to the core, then Mr. Farb could not have prevented his fraud. Now, we don't believe that's legally true, but factually, that does not exonerate Mr. Corey for the consequences of his civil fraud. If a party commits a civil fraud and then exacerbates the harm caused by their civil fraud by committing a criminal fraud, they can't point to their later criminal fraud to say that their civil fraud hadn't hurt you. It is not an unexpected, unforeseen event that falls into the category of an intervening or superseding cause that would typically relieve a party of liability. There's some limited time left. If the court has questions about loss causation, I'd like to answer them. Otherwise, I would move on to the Texas Securities Act claim. The final order is the Texas Securities Act claim. Getting down to it, central question for the TSA order is whether the party's choice of Delaware law precludes a claim under the Texas Securities Act. We acknowledge that the district court was correct to say there is no binding precedence here. However, we do believe that the answer to that question is no for two reasons. First, if there is no substantial nexus between Delaware and the transaction itself, trial courts interpreting Delaware law, including those in Delaware, have allowed the plaintiff to bring a state law securities claim under another state's law. The clearest example of that is the JAC Enterprises case, which permitted a claim under Michigan law after dismissing a state law claim under Delaware law. The second reason is allowing a Texas Securities Act claim furthers the Delaware policy of limiting the reach of the Texas Securities Act. In FDG, the court held that parties choosing Delaware law do so subject to the law's inherent jurisdictional limitations. That means that parties know that they will not be governed by the Delaware Securities Act unless their transaction has a substantial nexus to Delaware. There's no dispute here that this transaction does not have a substantial nexus to Delaware. The sole basis was Ethereum's incorporation there, which as a matter of law is insufficient. And the choice of law analysis employed by the district court and the executives is inapt here. Even if Delaware law applies, the first thing you have to do is determine whether there is a sufficient nexus to apply to Delaware Securities Act. If there is not, then the home state securities laws should apply. I see my time is up. Thank you. Thank you, Mr. Ryan. Is it Mr. Masso? That's right, Your Honor. Thank you. Thank you. Good morning, Your Honors. May it please the court, my name is Jad Masso, and I represent Appawee Jason Corey. Turning first to the disclaimer of reliance issue. In two different provisions in this contract, two different provisions, the sellers disclaimed that they were relying on any representations made by any person or entity other than those that were in the contract. It was in 3.1A and again in 3.28C. The Delaware courts that have looked at provisions like this have explained that the purpose of having a provision like this is to define the universe of information on which the seller is relying for purposes entering into the contract and proceeding with the transaction. The question then is to what extent does a fraud clause like the one we have, to what extent, if any, does it limit the disclaimer? Now, I want to pause for a moment and just note that this issue is only applicable to two of the plaintiff's claims. One is the federal securities claim and the other is the Delaware common law fraud claim. I want to note, however, that the federal claim that the district court decided that the disclaimer was applicable to the federal securities claim based on analysis of the disclaimer under federal law. That issue has not been challenged on appeal and so we believe they waived any issue when it comes to the disclaimer applying to the federal securities law claim. That leaves only the Delaware common law claim that this issue would apply to. This being a case involving Delaware law, which everyone acknowledges, the question then is how would a Delaware court interpret this provision and interpret the fraud clause that is a part of it? And luckily for us, the Delaware Chancellory has done exactly that in the Kyron Hago case. The district court didn't have the benefit of that decision, but we do, and the Kyron Hago disclaimer in that case, as well as the fraud clause, are virtually identical to the one we have here. And the way that the Delaware courts reconcile these provisions is to say that it is not a carve out at all. It is instead a fraud claim based on contractual representations. Now, just because it does not add or remove a legal right doesn't mean that it is meaningless. I know that's the seller's position is that, for it to have meaning, it's actually got to add a claim or remove a claim, and they provided no law, no authority for that proposition. The Delaware courts have looked at this and said it does have meaning. It does have a purpose, and that purpose is to clarify that the right remains and that this provision won't be constrained to affect it. Mr. Ryan noted that there was a draft that had been circulated before that noted that there, you know, you have a fraud remedy, so we don't need to add anything additional here. I think it is important to look at that and look at the context of it because it was referring to a contractual, not an extra contractual issue. It was looking at the liabilities that were listed in the schedules to the agreement. So, in that context, the fact that we were noting that a fraud remedy exists actually bolsters our position by saying that the fraud remedy that the contract allows really does tailor only to contractual and not extra contractual representations. As for loss causation, the seller's theory appears to be that if Mr. Barton had kept his title of Mr. Barton's title change or his eventual departure as distinct from any other causes was actually a substantial factor in a theory of failure and ultimately their loss. I think it's important to talk for a moment about the standard, the legal standard for loss causation. Mr. Ryan mentioned a couple of the factors, but McCabe, the case out of Third Circuit that we rely on, actually goes into a little bit more detail about what loss causation involves. In determining whether a cause was a substantial factor, courts look to a number of considerations, including materiality, directness, foreseeability, and the potential for other causes. That comes all from the PSLRA, the statutes that underlies all of this, and the plaintiff has to actually distinguish the impact of the misrepresentation from other factors, because there can always be other factors like changed economic circumstances, investor expectations, new industry-specific or firm-specific factors that come into place that could have actually caused the loss. I think it was in the Ludlow case that they actually talk about isolating the losses, isolating the losses that this misrepresentation actually caused as well. I'll turn to those as time allows, but I do want to stop for a moment and recognize that he mentioned a number of pieces of evidence that were not actually presented to the district court. They attached, I think, over 1,000 pages of evidence to their MSJ briefing in the district court, but they only mentioned four documents. Those are the four documents that we discussed in our brief and are discussed in the Hearst and Farr brief, and those are very limited. Things like the stock register showing who invested and who didn't invest, those never got brought to the district court's attention. Simply burying a host of documents in a 1,000-page appendix isn't enough. You actually have to bring it to the court's attention for it to be at issue. Here, what we find in these emails talking about the work that needed to be done or the work that hadn't yet been done, what we find is no evidence that actually brings the link from Farr's title or his eventual absence to certain matters not being done or being done improperly, and then to certain investors choosing not to invest, to them there being a default on the loan, to them there ultimately being a collapse of the company and the inability to pay. There are a lot of links in this chain that simply aren't met. If you look at each of those links, we can identify other potential causes that they aren't able to distinguish and they didn't even try. For example, when we look at the email talking about all the things that needed to get done, this is the June 2013 email where Mr. Favre talks about, we've got all this work to do, there's a lot to do. What we don't have is evidence from the seller saying, and here's why Mr. Favre is the only person that could have done that. Where is the expert analysis that looks at the company, looks at the enterprise as a whole and says, this is the individual we needed to have. Not only could Mr. Corey not have done it, the controller couldn't have done it, the other financial personnel couldn't have done it, a new CFO couldn't have done it. Why is it so important that Mr. Favre and Mr. Favre alone was the individual that we had to have to save this company? Likewise, the August of 2013 email, the one that talks about the investors that backed out, for one, it was never presented to the district court that the investors in fact did back out. But even if they did, they each discussed other reasons why they were not interested in investing in Ethereum. Why is that? Was Mr. Favre the linchpin or would they, even if Mr. Favre had stayed on, would they or wouldn't they have invested? The sellers very well could have gotten testimony from those investors to say, we would have done it if only Mr. Favre had been there. But they didn't. What we have from the investors is a litany of reasons why they didn't want to invest. Was Mr. Favre's absence one of them? Yes. But the obligation, the burden on the sellers in this case was to distinguish them. They had to isolate the losses from the harm, isolate the losses from the misrepresentation so that we can distinguish it. The concern that we see in case after case is that if you don't put this emphasis into loss causation, you run the risk of making this one misrepresentation an insurance policy for any loss that could have arisen from any cause. And that's exactly what we see here. Ethereum may well have failed for a variety of reasons. If you look at, Mr. Ryan mentioned this, the default letter that came from the mezzanine lender, it's in the record at 8298. They actually listed, I think there was a page long list of reasons they were holding the company in default. And they included things like failure to maintain a debt to earnings ratio, failure to maintain adequate liquidity, inadequate cashflow. These are things that likely had nothing to do with Mr. Favre's presence or his title for that matter. These were not all basic CFO tasks, even if we're assuming that there is such a thing as a basic CFO task. What they're trying to emphasize is that it had to be Mr. Favre, but they can't tell us why. And they can't draw the links between all these multiple steps in the chain of causation. And that they had to do. They had to present some evidence that it was a substantial factor, and it simply didn't get there. I know Mr. Stevens is going to talk about this a little more, so I'm going to take my last minute or two to discuss the choice of law issue, unless any of the court have questions. In the agreement, the sellers agreed that the internal laws of the state of Delaware would control not only the transaction, but also this very dispute. They didn't offer any contrary argument in the district court. In fact, they assumed that Delaware law applied, and they actually served a Delaware state law claim. And they recognized, the district court recognized, that this issue was essentially uncontested. They purported the challenge of it for the first time in their reply brief. The question then is, does Delaware law allow the sellers in this case to pursue a claim under the Texas Securities Act despite their choice of Delaware law? The answer is simply no. And the reason for that is simple, is that the Texas Securities Act is not an internal law of the state. And they're entitled to get whatever remedies Delaware law affords them. The fact that a particular statute may or may not offer them a remedy in this case is really inconsequential. Mr. Ryan mentioned the JAC case, and I think it's worth taking a look at. The JAC case was actually not a choice of law case. It was a 12 v. 6 case that dealt with the adequacy of the plaintiff's pleadings. There was a choice of law in that case. However, it was much narrower. It only the interpretation of the contract. But the issue was really neither here nor there, because it was not raised by any party. The out-of-state claims, the Michigan claims in that case, were not being challenged on the basis of the choice of law clause. They were simply being challenged on the sufficiency of the pleadings. And the court found that the pleadings were sufficient, that they had in fact stated the claim under Michigan law and allowed them to proceed. There is no case that says that when you choose the internal law of a Delaware, that a Delaware court would allow you to state claims based on any other state's law. They chose Delaware law here, and they should be held to that, to the exclusion of other states' laws. And we cited several cases in our brief where we get examples of courts doing exactly that. When you choose a state's law, it means you're choosing that state's law and not any other. With that, unless the court has questions for me, I'll allow Mr. Stephens to use the microphone. We can't hear you. Thank you. The technology issues, I'm still learning. May it please the court, my name is Brian Stephens, and I'm here representing at the least Greg First and Thomas Barb. And I appreciate the comments of Mr. Masso. I believe that he's addressed many of these issues perfectly well. And if you have any questions for me, please feel free to stop me and let me know. I will add a few points and probably will not take a full eight minutes. But a few points that I think are important. And I will try and address these in the same order that they've been addressed before. And I apologize if they're a little bit scatter shot. On the disclaimer of reliance piece, there's been a lot of discussion about whether or not the fraud representation, fraud provision, fraud carve out, however it is styled, is superfluous. And I think it's important to remember that when contracting parties come together, they don't know what the ultimate outcome of the deal may be, what provisions may be challenged. There is a choice of law provision in this contract. It chooses Delaware law. The appellants are hanging their hat on an argument that because Delaware law controls that and Delaware law says that fraud, you don't need to reserve fraud in your contract for intra-contractual claims, that therefore this language was superfluous. But there was no indication. These parties are not omniscient. They can't see the future to know that someone wouldn't challenge the Delaware choice of law provision like appellants have done here. And therefore, putting language in a contract such as the language that was provided by the parties that the acquirer acknowledged that the appellants could bring a fraud claim is not surplusage. It is to clarify the rights of the parties so that regardless of what choice of law analysis a future court may apply, the parties know that as for intra-contractual claims, there is an ability for the sellers or the appellants to have that remedy here. There really is no interpretation that the appellants have provided the court that preserves a meaning for the disclaimer of reliance unless it is construed in a way that the Delaware courts have done in harmonizing these types of provisions. And primarily, the appellants have tried to distinguish the cases cited by the appellees on the basis that the fraud provision was in a separate provision and therefore didn't apply. As Mr. Maslow said, the Cairo-Hago case makes it very clear that that argument is irrelevant and does not hold water. When you look at the case law, it's very clear that the fraud carve-out provision in this case does not address the universe of facts upon which the plaintiffs, the appellants were agreeing that they were going to rely. And so notwithstanding the fact that there may be a provision that says that they are entitled to bring a fraud claim or that the acquirer acknowledges that they can bring a fraud claim, that does not undo the fact that the appellants have agreed that they are only relying on those things that are in the contract. There's some implication in the anti-reliance provision, disclaimer of reliance provision was not intended to apply to intracontractual, extracontractual. It simply doesn't make sense if that's the case because then why would they have a disclaimer of reliance provisions at all? What would they be disclaiming reliance on if they could open Pandora's box and argue that any representation was something that they relied on? What is the substantial connection to Delaware? The connection to Delaware in this case is that Ethereum is a Delaware company. The securities that were being sold were Delaware securities and the company I believe is headquartered in Delaware. The issue with respect to substantial connection, however, I believe goes back to the party challenging a choice of law provision has a responsibility under the restatement to show that there is no substantial connection. It is not the party who is trying to enforce the choice of law under the Texas choice of law rules. Texas recognizes the party's ability to freely contract for the application of another state's laws. It is the party challenging the choice of law who has the obligation to show that some other state's law should apply. Here the district court correctly held that the appellants did not brief the issue correctly and because they hadn't briefed the issue and hadn't addressed the question, then it was obvious that the default of the party's contractual choice should apply. The plaintiffs also conceded that there was a substantial connection by pleading other Delaware claims. The plaintiffs bring a Delaware common law fraud claim and concede that Delaware law applies and are here telling the court that the disclaimer of reliance provision is the fraud carveout is superfluous under the appellee's interpretation under Delaware law. Therefore, the question of whether or not there is a substantial connection I think is something that has already been conceded in a way by the appellant here. In any event, with respect to the choice of law provision, there are numerous cases that we cited in our briefing, all of which hold essentially the same thing, that when you choose a state's law, you are at the same time rejecting other states' laws. And that has to have a meaning. It means that when the parties consciously decide Delaware law is going to control, that they're consciously deciding that they are rejecting other states' laws. And that's exactly what happened in this case. Looking at the record, if you look at record site 2113, there's a declaration of Jason Corey in which he attaches one of the drafts of the deal documents. And in the draft deal document, you'll see that the original had a Texas choice of law provision. And that choice of law provision was rejected by the parties in favor of a Delaware law provision. So this was an arms-linked transaction fully negotiated by the parties to choose Delaware law and reject Texas law. And the application of Texas Security Act claim should not be allowed given the Delaware case law and other case law that we cited. I will note that the appellant's time, I see my time is up. So I'll stop there. Thank you very much. Thank you. Mr. Ryan. Thank you, Your Honor. I intend to follow the order of the original argument unless there are questions that the court has about any of the later issues. I'll start with disclaimer of reliance. First question asked by Mr. Stevens was what effect does our interpretation of the fraud card out give to the disclaimer of reliance? The answer to that question is simple. It excludes claims that are non-fraud or kind of quasi-fraud claims where reliance is announced, such as promissory estoppel or negligent misrepresentation. The other thing, the other meaning that it gives is it gives meaning to the party's intent. The effect of what we did was a conditional promise. Mr. Masso referenced sections 3.1 and 3.28. Both of those are expressly made to be subject to the fraud card out. The effect of that was to create a conditional promise, effectively to say, we promise not to rely on what you've told us outside of the contract if you promise not to defraud us. Once they have defrauded us, they can no longer hold us to the promise made that we would disclaim reliance. That's the effect given to the fraud card out by our interpretation. That's also the only reasonable interpretation that can be given from section 3.28d, saying that nothing else in the agreement limits our right to bring these claims for fraud. If Mr. Farb's role in the company was so crucial and key, why was that not put in the representation and warranty section of the deal? It actually is, Your Honor, and the district court found that it was represented that Mr. Farb would continue to be the CFO of the 3A, that the company would provide a cap table, a capitalization table. That cap table contained as an exhibit a divide of who in management would be owners of the various shares in the company, and it listed the ownership after closing. It listed Mr. Farb as the CFO. So that was one of the intra-contractual representations that the court found there to be a fact issue. Mr. Massow, or Mr. Massow, excuse me, asked how it is that we can distinguish our argument from the other cases, and the answer to that is also simple. It's the location of the fraud carve-out. In these other cases, including Cairo and Hago, a fraud carve-out is in the exclusive remedies provision. When a fraud carve-out is in an exclusive remedies provision, that means that a party, in asserting a claim for fraud, is not bound to the contract indemnification procedures. The reason why those cases do not apply here, we did not agree to an exclusive remedy provision. The exclusive remedy provision is in section 9.11 of the agreement, and it only binds Ethereo. It does not bind us. So it doesn't make any sense to say that the fraud carve-out exempts the sellers from having to comply with an indemnification process that we never agreed to in the first place. To the point that Cairo and Hago addresses this location question, it absolutely does not. At page star 5, the court states that the purpose of the fraud carve-out is to clarify the intent to preserve the remedies provided in article 7. Article 7 of the Cairo and Hago agreement is the indemnification and exclusive remedies provision. It makes no sense to say that we carved out from an exclusive remedy provision that we never agreed to. For the loss causation question, I think that where we are is Mr. Masso is intentionally restricting the nature of the plaintiff's argument. We did not say that causation was because Mr. Favre changed his title. Causation occurred because Mr. Favre quit his job, and the effect of that was to leave Mr. Corey, a dishonest man and a criminal man, in charge of Ethereum's finances. That is within the zone of risk concealed by the representations that it would have this financial management. Mr. Masso also says, well, businesses can fail for other reasons. That's true, but proximate causation only requires that we prove that it be a substantial factor, which can be one of many, and second, no one, not these executives here or the district court, has ever identified any reason for the company's failure other than financial mismanagement because Mr. Corey was controlling the company's finances. In fact, the district court concluded that it was Mr. Corey's criminal conduct that caused the devaluation and failure of Ethereum. To the point that we did not cite the evidence in our summary judgment brief, that is not correct. He states that we did not cite the stock register. Yes, we did. It's on page 7072 of the record in our summary judgment brief. A comparison between what we had and what the district court had and all the evidence it needed. Thank you. That will conclude the arguments for today in this case with the end of submission. Thank you all again very much for your cooperation and participation today. We appreciate it. Thank you, Your Honor.